IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NUMBER: **09-CV-61753-Ungaro-Simonton**

MICHAEL SILVERI & DEBORAH SILVERI

       Plaintiffs in Interpleader,

vs.

NORTHERN INSURANCE COMPANY OF
NEW YORK, STEPHEN G. CAMPOS and
DIANE CAMPOS

       Defendants in Interpleader.

_____/

FILED by _VT_ D.C.
ELECTRONIC

**Nov. 2, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

## COMPLAINT IN INTERPLEADER

    Plaintiffs, MICHAEL & DEBORAH SILVERI , by and through undersigned counsel and pursuant to Title 28, United States Code, Sections 1331, 1333, 1335 and 1337 hereby file this Complaint in Interpleader against Defendants, NORTHERN INSURANCE COMPANY, STEPHEN G. CAMPOS and DIANE CAMPOS and in support thereof, state as follows:

### PARTIES

    1.    Plaintiffs are citizens of the State of Florida and are owners of the motor vessel called the M/Y TRUCKIN OFF ("M/Y TRUCKIN OFF"), which is insured by Ace Insurance Group, among others.

    2.    Upon information and belief, Defendants, STEPHEN G. CAMPOS and DIANE CAMPOS ("CAMPOS"), are citizens of the State of Florida, and are owners of a motor vessel called the M/Y SPLENDEUR DEUX ("M/Y SPLENDEUR DEUX").

3.      Defendant, NORTHERN INSURANCE COMPANY OF NEW YORK (hereinafter "NORTHERN INSURANCE") is a licensed insurance company organized under the laws of State of New York, and upon information and belief does business in the State of Florida, and insured the M/Y SPLENDEUR DEUX

## JURISDICTION AND VENUE

4.      This is an action of interpleader in which the Defendants are adverse claimants to the proceeds of an insurance policy in the sum of $105,836.59 (one hundred and five thousand, eight hundred and thirty six dollars and fifty-nine cents).

5.      This Court has jurisdiction pursuant to Title 28, United States Code, Section 1333 and 1335 and because the incident arose out of the collision between the M/Y SPLENDEUR DEUX with the M/Y TRUCKIN OFF on or about May 27, 2997 while both vessels were upon navigable waters of the Florida Intracoastal Waterway in Fort Lauderdale, Florida.

6.      Venue in this jurisdiction is proper pursuant to Title 28, United States Code, Section 1397.

## FACTUAL BACKGROUND & PRAYER FOR RELIEF

7.      Upon information and belief, on or about May 27th, 2007, the M/Y Splendeur Deux was struck by the M/Y Truckin Off.

8.      The Campos' filed a claim with their insurance company, Northern Insurance, for the damage sustained to the M/Y Splendeur Deux.

9.      Disputes between the Campos' and Northern Insurance culminated in an arbitration award on or about August 26th, 2009. A true and correct copy of that arbitration award is attached hereto as Exhibit B.

10.     On or about September 29th, 2009, Northern Insurance paid to Stephen and Diane

2

Campos the sum of One Hundred and One Thousand Eight Hundred Thirty Six Dollars and Fifty Nine Cents ($101,836.59) for damage sustained to the Campos' vessel M/Y SPLENDEUR DEUX as a result of its collision with M/Y TRUCKIN OFF. A true and correct copy of the Policy Release is attached hereto Exhibit A.

11.     Northern Insurance purports to be the subrogee of the Campos', and through its counsel Fertig & Gramling, has made a demand on Plaintiffs for payment of the amount paid by Northern Insurance to the Campos'.  Northern Insurance is also threatening to arrest the M/Y TRUCKIN OFF.

12.     Similarly, the Campos, through their counsel Moore & Co., have also demanded payment from Plaintiffs and are threatening to arrest the M/Y TRUCKIN OFF.

13.     As a result of the demands made by both Defendants, Plaintiffs have been holding "settlement proceeds" in the amount of $105,836.59 in escrow, not able to pay either of the Defendants without risking exposure to a law suit and the arrest of the M/Y TRUCKIN OFF.

14.     Each of the Defendants named in this lawsuit declare they are the person entitled to the settlement proceeds and have made a demand for the same.

15.      By reason of these conflicting claims of the Defendants, Plaintiffs are in great doubt as to which Defendant is entitled to payment of the amount of the settlement proceeds.

16.     Therefore, Plaintiffs file this interpleader action in good faith and due to the possible exposure to double or multiple liability unless the claims are resolved in one action, as Plaintiffs cannot ascertain who is entitled to the settlement proceeds.

17.     Plaintiffs claim no interest in the settlement proceeds which are the funds of their liability insurer ACE.

18.     Pursuant to filing this Complaint, Plaintiffs will deposit with the Clerk of the

3

District Court the sum of $105,836.59 representing the settlement proceeds described in paragraph 13 no later than Monday, November 9, 2009.

WHEREFORE, Plaintiffs pray for judgment against each Defendant in Interpleader as follows:

1. That each of the Defendants be restrained from instituting any action against Plaintiffs or the vessel, M/Y Truckin Off for recovery of the settlement proceeds or any part of it.

2. That the Defendants be required to interplead and settle between themselves their rights to the settlement proceeds and that Plaintiffs be discharged with prejudice from any and all liability.

3. That Plaintiffs recover its costs and attorney's fees.

4. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: 11/2/09

/s/
Stephanie Handler
Florida Bar No.
COZEN O'CONNOR
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4410
Miami, Florida 33131
Telephone:   (305) 704-5945
Facsimile:   (305) 704-5955
-and-
James F. Campise
Florida Bar No: 633291
Cozen O'Connor
45 Broadway
16th Floor
New York, NY 19103
(212) 509-9400

*Attorneys for Plaintiff*

4

# EXHIBIT A

## POLICY RELEASE

That, Diane and Steven G. Campos, individually and as owners of the M/Y Splendeur Deux, their heirs, beneficiaries, legal representatives, successors and assigns (hereinafter called First party) for and in consideration of the sum of One Hundred One Thousand Eight Hundred Thirty Six Dollars and Fifty Nine Cents ($101,836.59) or other valuable considerations received from or on behalf of Northern Insurance Company of New York on behalf of their respective owners, their respective parent, subsidiary, affiliated, interrelated, and successors companies or divisions, and the past, present and future shareholders, owners, operators, lessors, directors, officers, trustees, agents, employees, managers, adjusters, investigators, attorneys, insurers, underwriters, independent contractors, legal representatives, beneficiaries, predecessors, divisions, agencies, subsidiaries, affiliates, successors and assigns and/or all other known or unknown persons, firms, partnerships, corporations, joint ventures (hereinafter called "Second Party"), the receipt whereof is hereby acknowledged.

FIRST PARTY HEREBY remise, release, acquit, satisfy, and forever discharge the said second parties of and from any, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which said first party ever had, now has, or which any personal representative, successor, heir or assign of said first party, hereafter can, shall or may have, against said second party, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of these presents regarding any and all claims for physical damage coverage under Northern Insurance Company of New York  policy number43828532, issued to first party as more particularly plead in the legal action filed in U.S. DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA, IN ADMIRALTY, MR. STEVEN CAMPOS, Plaintiff,v. NORTHERN INSURANCE COMPANY  OF NEW YORK, a member of ZURICH FINANCIAL SERVICES, Defendant. Case No.: 08-21429 CIV Hoeveler/Garber

FIRST PARTY HEREBY remise, release, acquit, satisfy, and forever discharge Second Party, and each of them, of and from all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law, in admiralty or in equity, which First Party ever had, now has, or hereafter can, shall or may have against the Second Party, or any of them, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of these presents including, but not limited to, any and all known or unknown injuries, losses, or

Policy Release Page 1 of 5

damages sustained by the First Party, or any of them, arising out of the subject incident, and/or any and all claims concerning, relating and/or pertaining to the M/Y Splendeur Deux; and/or any and all claims arising out the insurance policy entered into between First Party and Second Party.; and/or any and all claims arising from any alleged negligence, strict liability, misrepresentation, fraud, breach of contract, quasi contractual liability, bad faith, extra-contractual damages, breach of bailment, breach of any express or implied warranty, breach of any statutory or regulatory duty, and/or any other tort or other claimed wrongful act or fault of Second Party, or any of them, and/or any and all known or unknown claims for property damages, loss of use, loss of profit or charter hire, loss of income or revenue, attorneys fees, penalties, fines, interest, compensatory, consequential, incidental, statutory, regulatory, punitive, exemplary and/or any other damages; and/or any and all claims that are alleged or could have been alleged in connection with those certain proceedings filed in U.S. DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA Case No.: 08-21429 CIV Hoevler/Garber.

AS FURTHER CONSIDERATION for the above mentioned payment, First Party expressly warrants, represents and agrees as follows:

1. That Steven G. Campos and Diane Campos are the Owner of the M/Y Splendeur Deux.

2. That no other persons, firms, partnerships, corporations, or entities have or have had any interest in the claims, demands, obligations, or causes of action referred to above; that First Party has the sole right and exclusive authority to execute this GENERAL RELEASE and receive the sum specified above; and that the First Party has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations, or causes of action referred to above.

3. In executing this General Release the First Party declares and represents that they are not relying on the advice of the Second Party, or any of them, as to the legal effect or any other consequences of any kind arising out of this settlement or the execution of this General Release. First Party further represents that they have relied upon the legal advice of their own attorneys who are the attorneys of their own choice, and that the terms of this General Release have been completely read and explained to First Party by their attorneys; that the terms of this General Release are fully understood and voluntarily accepted by Second Party for the purpose of making a full and final compromise, settlement and adjustment of any and all claims, disputed or otherwise, on account of any known or unknown injuries, damages, losses or claims previously mentioned and for the express purpose of precluding

Policy Release Page 2 of 5

forever any further or additional claims for losses or damages, known or unknown, that may ever result from the foregoing described subject incident and/or any other matter being released. First Party further expressly acknowledges and assumes all risk, chance or hazard that their claims or damages are or may become greater or more extensive than are now known or anticipated.

4. First Party agrees to cooperate fully with Second Party, and to execute any and all supplementary documents, and to take all additional actions that may be deemed necessary or appropriate to give full force and effect to the terms and intent of this General Release which are not inconsistent with its terms.

5. It is further understood and agreed that this General Release is to be construed in accordance with the laws of the State of Florida.

6. It is understood and agreed to by First Party that this Settlement is a compromise of a disputed and contingent claim, and that payment is not to be construed as any admission of liability on the part of the Second Party or any of them, by whom liability is expressly denied.

7. This general release contains the entire agreement between the parties, and supersedes and cancels all prior agreements, understandings, representations not expressed in this General Release and cannot be changed, modified, or altered except by a writing signed by the Second Party.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 29 day of Sept , 2009.

Signed, sealed and delivered

Sign: _____
Steven G. Campos
Print: STEVEN CMPOS

Sign: _____
as Representative of Northern
Insurance Company of New York
Print: Theodore Feltman III

Sign: Diane R. Campos
Diane Campos
Print: DIANE R. CAMPOS

Policy Release Page 3 of 5

SEP-21-2009 10:48   MARINE CLAIMS   P.05

**STATE OF FLORIDA**
**COUNTY OF**

october   The foregoing instrument was acknowledged before me this 1st day of
September 2009, by Steven G. Campos, , who is personally known to me or who
has produced_____ as identification and who did take an oath.



MONICA DELSOL-DIAZ
MY COMMISSION # DD894765
EXPIRES August 07, 2013
(407) 398-0153   FloridaNotaryService.com

NOTARY PUBLIC:
Sign: Monica Delsol-Diaz
Print: Monica Del Sol
State of Florida at Large (Seal)
My Commission Expires:

**STATE OF FLORIDA** Commonwealth of Massachusetts
**COUNTY OF** Bristol

The foregoing instrument was acknowledged before me this 29 day of
September 2009, by Diane Campos, , who is personally known to me or who
has produced Valid Drivers Lic as identification and who did take an oath.

NOTARY PUBLIC:
Sign: Stacey Ann Santos

STACEY ANN SANTOS
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires on
June 2, 2011

Print: STACEY ANN SANTOS
State of Florida at Large (Seal)
My Commission Expires:
Commonwealth of Massachusetts

Policy Release Page 4 of 5



SEP-21-2009  10:48        MARINE CLAIMS                                    P.06

STATE OF
COUNTY OF

The foregoing instrument was acknowledged before me this 21 day of
September 2009, by Theodore Rittin III_____ as representative of Northern
Insurance Company of New York , who is personally known to me or who has
produced _____ as identification and who did take an oath.

NOTARY PUBLIC:
Sign: _____

Print: Jennifer Bryce Hill
State of Maryland_____ at Large (Seal)
My Commission Expires:

My Comm. Exp. 2/15/2013

(Seal)
This instrument prepared by:
Christopher R. Fertig, Esq.
Fertig & Gramling
200 S.E. Thirteenth St.
Ft. Lauderdale, FL 33316

Policy Release Page 5 of 5

TOTAL P.06

CASE NO. *

# EXHIBIT B

```
*********************************************
                                            *
In the Matter of the Arbitration            *
                                            *
        between                             *
                                            *
Stephen G. Campos, as Claimant              *
                                            *          FINAL AWARD
            and                             *          August 26, 2009
                                            *
Northern Insurance Company of New           *
York, as Respondent                         *
                                            *
Under a Master Mariner Yacht                *
Insurance Policy dated April 6, 2007        *
                                            *
*********************************************
```

Before:   Stephen H. Busch, Sole Arbitrator

Appearances:   Moore & Company, P.A., for and on behalf of
               Stephen G. Campos

               by: Johnlee S. Curtis, Esq. and Michael T. Moore,
               Esq., of counsel

               Fertig & Gramling, for and on behalf of Northern
               Insurance Company of New York

               by: Christopher R. Fertig, Esq. and Darlene M.
               Lidondici, Esq., of counsel


## BACKGROUND

At approximately 1900 hours on May 27, 2007, the M/Y *SPLENDEUR DEUX* (or "the vessel"), a 50-foot Krogen motor yacht owned and operated by Stephen Campos ("Claimant" or "Campos") was underway but stopped in the Florida Intracoastal Waterway northbound awaiting a bridge opening. The *SPLENDEUR DEUX* was about 10 years old when purchased by Campos in March or April of 2007 and was on her first voyage under his ownership. The operator of another 50-foot motor yacht, the *"TRUCKIN OFF"*, lost control of his vessel as he left a nearby marina southbound and collided with the *SPLENDEUR DEUX*, striking her on the port side and causing extensive damage. In a report

1

of the incident prepared by the Broward County Sheriff's Department, *"TRUCKIN OFF"* was found entirely at fault for the collision. According to the report, *"...The bow of [TRUCKIN OFF] with its anchor completely tore through the fiberglass on the port side of [SPLENDEUR DEUX] as well as pulling away the rub rail and leaving scratches in the gel coat almost the entire length of [SPLENDEUR DEUX]..."*[1] Campos did not consider the damage severe enough, however, to interrupt his cruise north for the summer season, and continued on his way. Upon arrival in New England waters, he had the damage surveyed and sought repair estimates from four area boatyards.

The *SPLENDEUR DEUX* was covered by a Master Mariner Yacht Insurance Policy issued by Northern Insurance Company of New York, a member of the Zurich Financial Services ("Respondent") and carried a $4,000 hull deductible. Campos notified Respondent of the casualty on June 8. He was then contacted by Respondent's local claims agent, Theodore Foltyn ("Foltyn"), who on June 12 sent Campos a request for an itemized repair estimate along with proof of loss and other forms that were to be completed and returned to Respondent. Foltyn stated that Campos advised him he was not certain he would make a claim against his own policy because he did not want to pay its deductible, and that he might instead proceed directly against the other vessel.[2] Claimant asserts that the forms were signed and returned on July 12. However, According to Foltyn, Campos did not return the forms and *"...after several calls to Mr. Campos and his agent requesting the completed information, a reservation of rights letter was issued addressing his failure to cooperate."* Foltyn stated that Campos ultimately submitted the requested documents through his attorney on August 13, although the proof of loss form was not notarized, and no repair estimate was included.[3] Clearly, matters were not off to a good start, and it appears it was at about this period in time that Campos engaged legal counsel to represent him in his dealings with Respondent.

Campos received repair estimates from the four yards between June 28 and August 7, forwarding each to Respondent. Ultimately, with Respondent's

---

[1] Claimant's Exhibit A – Florida Boating Accident Investigation Report, May 27, 2007.

[2] Foltyn Affidavit, Respondent's Main Brief Exhibit 3(10-14).

[3] Foltyn, 13, 14. This is at odds with Claimant's chronology, which states that the proof of loss and other forms were submitted to Respondent on July 12.

approval, he chose New England Boatworks ("NEB") for the job. In an August 7 letter to Campos, NEB gave an estimate of $53,263 for the job based on only making repairs to the damaged gelcoat, but suggested a better alternative was to paint the entire hull with Awlgrip (a patented, hard, glossy and long-lasting polyurethane finish) because *"...gelcoat repair can be very difficult to color match."* The Awlgrip alternative would add an estimated $16,200 to the total cost of repairs, excluding repainting the vessel's name and hailing port on the transom.[4] George Stafford ("Stafford"), a marine surveyor who attended the vessel on September 18 to appraise the damage and review the claim on behalf of Respondent, submitted an Affidavit on April 24, 2009 in which he concurred that the cost to Awlgrip the entire hull would add between $16,000 and $17,000 to the job. He also opined that Awlgripping the hull constituted betterment.[5]

On October 5, 2007, NEB provided Campos with a new, revised estimate of $72,450, the principal difference between it and NEB's August 7 estimate being that the October 5 estimate included not only repairing the damaged gelcoat, but sanding and resurfacing it on the entire port side of the vessel. Claimant also referred to a second October 5 estimate from NEB for $67,450.00 to repair the gelcoat and then Awlgrip the entire hull.[6] However, the estimate itself was not produced and there was no other support for it. Apparently, it came from discussions within and between NEB and Campos. Neither the August 7 nor October 5 estimates included replacing the rub rail on the entire yacht, the cost of which eventually added considerably to the estimate given for replacing only the damaged portions of it.

Repairs to the *SPLENDEUR DEUX* were undertaken and for the most part completed in the fall and early winter of 2007. On December 6, Claimant submitted an invoice to Respondent for $89,033.26, most of which was for NEB's services in the amount of $82,250.66, including gelcoat repair, replacing the PVC rub rail and Awlgripping the hull. In addition, there was an estimate for $3,000 to repaint the vessel's name and hailing port on the transom in gold

---

[4] Respondent's Exhibit 24, NEB estimate dated August 7, 2007.
[5] Respondent's Exhibit 25, Affidavit of George Stafford.
[6] Claimant's Rebuttal Exhibit Q

3

leaf [7] and $2,352.60 for personal expenses incurred by Campos, including travel and time spent in connection with repairs to his yacht. In a letter to Claimant on December 31 addressing the December 6 invoice, Respondent calculated the amount payable against the claim was $51,214.10 (before deductible), arguing that Awlgripping the entire hull constituted betterment and was not covered under the terms of the policy. In addition, Respondent noted that although the August 7 estimate provided for replacement of damaged sections of rub rail only, the entire rub rail had been replaced, including an improved rigid vinyl base for it, at an additional cost of nearly $18,000.[8] Respondent also declined to pay for repainting the vessel's name, or for Claimant's personal expenses, arguing that repainting the name was not related to the collision damage and that under the policy Campos had a duty to assist and cooperate with Respondent in the repair effort without expectation of compensation. Respondent stated that if Claimant disagreed with its offer, Respondent would then make further investigations with NEB through an audit of their records for all repairs, change orders and invoices for work done on the *SPLENDEUR DEUX*. Ultimately, Respondent conceded most of the additional cost of replacing the entire rub rail with rigid vinyl. The vessel was 10 years old and had been built in Taiwan. Campos testified that neither he nor NEB were able to locate rail sections that matched the original PVC installed when the vessel was built. Hence, there was no option but to replace the entire rail.

The relationship between the parties continued to deteriorate and on January 9, 2008, responding to what was perceived as an implication Claimant was attempting to defraud Respondent, Claimant filed a bad faith complaint with the Florida Department of Financial Services, which Respondent defended on February 26.

On February 21, Claimant proposed to Respondent that they *"...agree now on a procedure for a fast arbitration..."*[9] Although Respondent argues that arbitration negotiations were ongoing, there is no documentary evidence of any other discussion of arbitration beyond Claimant's February 21 proposal.

---

[7] The yacht's name and hailing port were originally hand-lettered in gold leaf on the transom. NEB had replaced them with temporary vinyl lettering after Awlgripping the hull.

[8] The PVC rub rail not only offered protection for the topsides but also served as a cover and protection for the hull to deck joint. It, in turn, was capped with 1-inch stainless steel half-oval finish rail.

[9] Claimant's Rebuttal, Exhibit G; email from Michael Moore to Chris Fertig.

4

On March 19, an audit of NEB's records relating to work done on the vessel was conducted by Stafford. Mark D. Ashton ("Ashton") of Independent Marine Systems representing Campos, was also present. Ashton found that the total loss-related NEB invoices then totaled $92,992.43, after allowing credits for non-loss or maintenance items, as set forth in a letter to Stafford that day. Stafford did not, apparently, contest Ashton's findings, but in any event no payments were forthcoming from Respondent and the matter continued to languish. There is no evidence that Stafford ever responded to Ashton or offered his own analysis of loss-related costs as of March 19.

By May 8, 2008, Claimant alleged it had not received any payments, or a response to its proposal to arbitrate, and advised Respondent of its intent to file suit. On May 16, still without response, Claimant filed suit in the U.S. District Court for the Southern District of Florida, seeking a declaratory judgment on its claim. Respondent moved to dismiss the suit or, alternatively, compel arbitration. Claimant opposed the motion to dismiss, arguing that because Respondent had ignored Claimant's efforts seeking to arbitrate, and because it had failed to respond meaningfully in resolving the claim, it had, in effect, waived arbitration.

On August 1, 2008, Respondent offered to settle the claim for $85,000, but the offer was rejected by Campos because it was only about one-half the amount he believed he was entitled to at that time. It was also evident that Campos wished Respondent to waive its right to subrogation under the policy, which Respondent declined to do.[10]

In an Order dated March 16, 2009, The Court granted Respondent's motion to compel arbitration. However, on or about December 19, 2008, well before the Order was issued, the parties had apparently already decided to arbitrate their disputes and agreed upon me as sole arbitrator.

By agreement, the proceeding was conducted through documentary submissions alone, and was governed by the Arbitration Rules of the Society of Maritime Arbitrators, Inc. ("SMA"). Claimant submitted a preliminary arbitration brief on January 7, 2009. Following the deposition of Campos in

---

[10] Claimant's Rebuttal Exhibits L, M.

5

Florida on April 2, 2009, main briefs and exhibits were submitted, followed by
rebuttal briefs, exhibits and surreplies.

## The Claims

From the time that Campos began collecting estimates until final briefs
were submitted, the amount of his claim has fluctuated considerably. From the
initial August 7, 2007 NEB estimate of $53,263.00, the claim had risen to
$273,717.98 by March 16, 2009 with the addition of other claim items,
attorney's fees of $55,732.70, consequential damages in the amount of
$71,819.22 and prejudgment interest of $36,318.12, calculated at 11 percent.
The consequential damages consisted of the estimated cost of returning the
vessel to Florida with a captain and crew; lost equity in the yacht; and
Claimant's mortgage payments and insurance premiums for the period he was
without use of his yacht, all of which have since been dropped from the claim.
Following his deposition on April 2, the claim stood at $212,563.39. The
amount of Campos's claim is now $107,104.54, plus interest. The principal
claim is comprised of three NEB invoices totaling $93,504.44; new rigid vinyl
rub rail, $1,430.00; the estimate for repainting the vessel's name, $3,000.00;
Campos's personal expenses, $2,352.60; survey fees, $1,900.00; and slip fees
for the 2007 summer season, $4,917.50. Claimant concurs with Respondent
that the average rate of interest, measured from the date of the loss, should be
5.81 percent per annum and seeks prejudgment interest on his claim at that
rate. He has left the question of whether he is entitled to recover his attorney's
fees and if so, in what amount, for the arbitrator to decide.

Respondent contends Claimant is entitled to $71,077.47, including
prejudgment interest calculated at the Federal Standard of 5.81 percent per
annum and after applying the policy hull deductible. Respondent also contends
that under the general maritime law of the United States, which governs
dispute resolution under the policy, Campos is not entitled to recover his
attorneys' fees.

6

<u>DISCUSSION AND ARGUMENT</u>

Although the amount that Respondent owes Campos is at the heart of the dispute in this arbitration, there was considerable argument surrounding the sworn proof of loss form. Pursuant to the terms of the policy, proper submission of this form was a prerequisite to the settlement of any claim. [11]

The issue is whether the proof of loss form, which, according to Respondent, has never been sworn to, was a legitimate reason for the alleged delay in payment of the claim. It is evident that the original was completed by Campos and submitted on July 12, 2007, but it was not notarized and no quantified statement of claim accompanied it.[12] However, it was notarized and resubmitted on January 7, 2008 with the July 12 date lined out and initialed, one month after Claimant forwarded the $82,250.66 NEB bill to Respondent, along with bills for Campos's personal expenses and repainting the vessel's name. According to Respondent, the form has still not been correctly submitted.[13] However, despite policy language warning that coverage would be denied if the insured failed to furnish a signed sworn proof of loss statement, Respondent never stated it would not honor Campos's claim. To the contrary, it has made clear that it was not denying coverage and that Campos would be compensated for his loss.[14] As Campos has received no payments at all from Respondent to date, the issue of whether he has been prejudiced by the delay in settlement will be addressed later in the Award. But in any event, from the evidence presented, even if the proof of loss form was never submitted to Respondent's satisfaction, the issue is moot for the purposes not only of assessing the validity of Campos's claim, but determining the amount of it.

The parties' substantive disputes are in two parts: those involving vessel repairs; and those surrounding the legal issues with respect to awarding attorney's fees and prejudgment interest. Where applicable, repair items are referenced with applicable invoice numbers for ease of reference.

---

[11] See Appendix A for a recitation of relevant portions of applicable policy terms and provisions.
[12] The printed form included language beneath the policyholder's signature for it to be sworn to, i.e., notarized.
[13] Respondent's Rebuttal brief, June 17, 2009
[14] Respondent's Brief, Exhibit 1: 10/19/07 email from Foltyn to Moore. See also, Brief p. 2.

7

<u>Hull Repairs - $82,250.66: NEB Invoice No. 127391</u>

   The most contentious of the disputes concerns the method used to repair the collision damage and refinish the hull. Campos argues that because NEB had cautioned him about the potential difficulty that might be encountered in color matching the original gel-coat, he followed their recommendation to paint the entire hull with Awlgrip.[15]  However, Respondent points out that in his deposition, Campos insisted that the condition of the gelcoat was excellent, and that he didn't notice any fading due to sun or age.[16]  Therefore, Respondent contends that local gelcoat repair and color matching alone would have been sufficient, and that Awlgripping the hull went well beyond necessary repairs because it improved other, undamaged parts of the vessel as well. Because NEB's first estimate provided for the option to Awlgrip the hull at an additional cost of $16,200, Respondent argues that $16,200.00 must be deducted from any amount ultimately found owing to Claimant.

   Putting the Awlgripping issue and its costs aside for the moment, there were two other ways to approach repairing the damage. The first was as per NEB's August 7, 2007 estimate of $53,263.00, providing for gelcoat repairs in way of the damage only, and matching the repaired gelcoat to the undamaged surface surrounding it. The second was as detailed in NEB's October 5, 2007 revised estimate for $72,450.00, which would have provided, in addition, for refinishing all of the gelcoat on the port side above the waterline. Either method would have addressed only the damage suffered in the collision, nothing more. Hence, the issue is which of the two methods would have been most prudent and consistent with customary marine repair practice under the circumstances. In this respect, it is instructive to quote a portion of Stafford's affidavit:

> *"The pre-existing condition of the gel coat and exterior hull finish of the boat was very good and therefore, there would be no difficulty of matching the gel coat within acceptable limits. <u>This is especially true when recoating the entire port side and ending with breakpoints at the bow and transom.</u>"* [17]

---

[15] Gelcoat is subject to fading over time, and from the ultraviolet effects of sunlight.
[16] Campos Deposition, 7(22)-9(4).
[17] Stafford, (10)

8

and,

> *"My notes reflect the fact that originally we were quoted by New England Boatworks $225 per linear foot to re-gel coat the port side (damaged side only). That would equate to $11,925. The New England Boatworks cost to Awlgrip the hull was $28,364. Therefore the cost to apply Awlgrip was approximately $17,000.00 more than gel coat. This is in keeping with New England Boatworks' original estimate of $16,200 additional cost to Awlgrip the hull."[18]*
> (Emphasis added)

It is evident from Stafford's Affidavit that refinishing the gelcoat on the port side between natural "breakpoints" – not just making spot repairs – would have been the recommended course of action. It is also noteworthy that three of the other estimates were based on this method as well. Moreover, all of the repair estimates cautioned against trying to match the gelcoat and/or offered the option of Awlgripping the hull.[19]

From the evidence presented, I conclude that the best method of repair, consistent with customary marine repair practices and other policy terms, would have been to refinish the gelcoat on the port side between the vessel's stem and port transom corner.

Under the terms of the policy, Respondent was only required to pay for repairs made to covered damage. Strictly speaking, therefore, Claimant would not ordinarily be entitled to recover the $28,389.57 cost of Awlgripping the vessel, as detailed within NEB's Invoice No. 127391.[20] However, NEB's October 5, 2007 estimate has established it would have cost $32,500.00 to refinish the gelcoat on the port side, $4,110.43 more than it cost to Awlgrip the entire vessel. [21]

By my findings above, at the end of the day Respondent would have been obligated to Claimant for the cost of refinishing the gelcoat. Had that cost been less than the cost to Awlgrip the vessel, Claimant would only be entitled to

---

[18] Stafford, (15). Stafford's notes were not introduced as evidence, and there was no other evidence to support his recollection and NEB's written estimate to re-gelcoat the port side.

[19] Claimant's Rebuttal Exhibit B(2) and documents attached to Moore & Co. email of February 17, 2009.

[20] Had the hull been previously Awlgripped, the most prudent repair would presumably have been to re-Awlgrip the port side only, after making required repairs to the hull and gelcoat.

[21] A similar difference was referred to in Claimant's undated analysis of various work estimates. See Claimant's Rebuttal Exhibit Q.

9

recover the lesser amount. Because it would have cost more, however, and a net savings has accrued to Respondent, I find the fact that the Awlgripping involved undamaged parts of the *SPLENDEUR DEUX* and may have enhanced her value generally to be a moot issue. Accordingly, Claimant is entitled to recover the costs associated with Awlgripping the vessel, and Respondent's claim for a $16,200 deduction from this invoice for the Awlgrip work is denied.

Repainting Name and Hailing Port - $3,000.00

The vessel's name and hailing port were hand-painted in gold leaf on the vessel's transom before the casualty, but had to be removed in connection with Awlgripping the hull. Campos contends he is entitled to recover the costs of repainting the name and hailing port in gold leaf in order to return the yacht to its pre-casualty condition, and has submitted an estimate of $3,000 for this job. The name and hailing port have been temporarily applied in vinyl letters by NEB, whose invoice includes $323.20 for labor and materials for this work. [22]

My finding that Claimant is entitled to recover the Awlgripping costs derives only from an equitable application of a mathematical cost benefit to Respondent and does not alter the fact that under the policy Claimant may only recover costs associated with the collision damage. It is quite evident that repainting the vessel's name and hailing port on the transom in gold leaf or anything else was unrelated to the collision damage, and was necessitated only in connection with Awlgripping the transom. Accordingly, Claimant may not recover this cost, nor, for the same reasons, may he recover the $323.20 associated with re-applying the name and hailing port in vinyl letters.

Claimant's Personal Expenses - $2,352.60

Campos contends that he is entitled to be reimbursed for various personal expenses in connection with the casualty, consisting of his time and costs to move the vessel to various Narraganset Bay boatyards for estimates and surveys; two round trip flights to Florida in connection with locating replacement rub rail for the vessel because NEB could not locate a replacement; and the cost to ship a piece of deck hardware from Florida to NEB. Respondent

---

[22] NEB Invoice No. 127391, Operation No. 404.

argues that with the exception of the deck hardware that was to replace a part damaged in the collision, none of these costs are recoverable, because they were not directly related to the casualty. With respect to Campos's travel to and from Florida, Respondent suggests that because the entire rub rail was replaced, any vendor would have sufficed, and, in fact, the replacement rub rail was ultimately purchased from an internet supplier, rendering such travel entirely unnecessary. With respect to Claimant's time, Respondent points out that Campos has provided no support for the value of his time at $100 per hour and, moreover, the policy terms require the insured to cooperate with and assist Respondent in the resolution of claims.

After reviewing the documents submitted with respect to this item, I conclude that with the exception of the $46.80 charge relative to the cost of shipping the replacement deck hardware item, there is an insufficient nexus between the items claimed and the casualty to warrant recovery, and they are denied.

Summer 2007 Slip Charges - $4,917.50: Borden Light Marina Invoice No. 1473

Campos asserts that this cost was necessitated by the casualty, in that the vessel had to be available for work estimates and surveys, rather than voyaging around New England waters as he had planned before the collision occurred. In addition, Campos contends he was fulfilling his duty under the policy to mitigate any further damage to the vessel by placing it in protective storage and is therefore entitled to recover such costs. Respondent notes that the insurance claim and repair plans were not made until after the end of the 2007 summer boating season, and argues that Campos used the yacht for personal pleasure throughout the summer.

Had the damage incurred in the collision rendered the vessel unusable, and had she been clearly "stored" awaiting repairs, Campos's claim in this respect might have merit. However, the evidence demonstrates otherwise. Not only did Campos continue on his trip to New England following the incident, but according to his own testimony he used the boat for pleasure on several

11

occasions during the summer.[23]  Under the circumstances, I do not find the summer slip fees to be a legitimate loss-related item. Accordingly, recovery of these charges is denied.

Survey Fees - $1,900: IMS Invoice No. 3042

This item concerns the fees charged by Claimant's surveyor, Mark Ashton, in connection with an audit Respondent conducted of NEB's job records for the *SPLENDEUR DEUX*. Claimant argues that Ashton's attendance was necessary, but Respondent argues that this was a paperwork audit that occurred after the repairs had been completed.  Respondent did not require the presence of Claimant's surveyor.  The audit arose out of what appear to be Respondent's legitimate concerns about being charged for various work items that were not loss-related, as articulated in its letter to Claimant on December 31, 2007.[24]  Less than a month prior to that Respondent had been presented with a single invoice[25] that included unexplained work to parts of the vessel that were not damaged in the collision, and, according to Stafford, NEB was working from two sets of invoices – one for Respondent and one for Claimant, neither of which it would agree to make available to Stafford, as Respondent's representative.

It is evident from the documents submitted that Respondent's concerns triggered its insistence upon an audit of NEB's records pursuant to the terms of the policy.[26]  Most, if not all of the repair work had been completed when the audit was conducted.  The purpose of the audit, as evidenced by Ashton's letter to Stafford,[27] was only to sort out NEB invoices for loss-related work that were to be submitted to Respondent.  There is no reference to this audit in Stafford's Affidavit, and if he documented his own findings in a written report it was not submitted in this arbitration.  Ashton recommended several invoices and one credit invoice be submitted to Respondent as rendered, suggesting only that $587.36 in materials and labor for replacing the zinc anodic protection be

---

[23] Campos, 27(4) to 29(9).
[24] Claimant's Rebuttal Exhibit E.
[25] Claimant's Rebuttal Exhibit D: NEB Invoice No. 127391 dated November 28, 2007 for $82,850.66, et. al.
[26] Yacht Policy, Part 1: Duties of an Insured (4).
[27] Respondent's Brief, Exhibit 22

12

subtracted from NEB Invoice No. 128395 because it was a maintenance related item. In any event, this was not a joint survey, nor do I find that there was any compelling loss-related reason that might mitigate in favor of requiring Ashton's services to be paid for by Respondent. Accordingly, Claimant's recovery of this expense is denied.

<u>Miscellaneous Items - $4,244.11: NEB Invoice No. 128325</u>

This invoice was for labor and material to launch the vessel in December 2007; additional interior repairs in way of the hull damage; and additional labor and materials involved in connection with installing the new rub rail. The only item Respondent disputes concerns labor charges for eight hours in connection with the installation of the new rub rail in the amount of $560.00: the $2455.29 cost of associated materials is not in dispute. Respondent gives no reason for its objection, but presumably it is because it believes the labor and materials to remove the old and install the new rub rail had already been billed in an earlier invoice. That invoice was for work performed through November 28, 2007: this invoice was dated and is for work completed through January 15, 2008.

The replacement rigid vinyl rub rail supplied by RubRails.com was ordered on November 5, 2007, so it is evident that the rub rail work invoiced through November 28 was related to its installation. It is also evident that the January 15 invoice covered the supply and installation of the stainless steel half-round cap on the previously installed vinyl rub rail. Hence, I am satisfied that the amount Respondent disputes was for additional work concerning the rub rail that had not been previously billed. Because all of NEB's estimates were subject to change depending upon the actual time and materials used, I see no reason to deny recovery of this item, and it is allowed.

<u>PVC rub rail – $1,430.00: RubRails.com Invoice No. 129270</u>

This item of the claim is not disputed by Respondent.

13

<u>Miscellaneous Items - $8,843.02: NEB Invoice No. 128395</u>

This invoice was for labor and materials associated with touching up the bottom paint around the waterline; replacing the zinc anodes; winterizing the yacht for the 2007-2008 winter season, including "shrink-wrapping"; and for compounding and waxing the deck. Respondent asserts that only $1,662.00 of this bill is loss-related, representing the labor to touch up the bottom paint around the waterline in preparation for wet winter storage. It contends the remaining costs concern routine maintenance items that were not loss-related.

Claimant argues that all of the items included in this invoice are directly related to the loss, because repairs had not been completed when the winter season began. In addition, NEB did not have inside storage available for the vessel, which necessitated launching her on December 8. Claimant argues that replacing the zincs and compounding and waxing the decks was necessary to prevent damage to the vessel while it was being repaired, despite Ashton's recommendation in March 2008 that the anodes and their installation were not loss-related and should be subtracted from the claim.

It is evident from deposition testimony that the unfinished repairs were "warranty" items on the loss-related repair work already done by NEB that NEB was obliged to make good on. Hence, it was necessary for the boat to remain at NEB until the repairs were completed. Because this work apparently continued through the winter and into the early spring, there is no question that the yacht had to be winterized in order to protect vital elements from freezing. Therefore, I find that the costs of winterizing the yacht may be recovered. Claimant contends that the zinc anodes did not need replacing prior to the collision and their replacement by NEB was done solely to protect the vessel during repairs. However, I am not persuaded by Claimant's argument and find the connection of this work to the loss to be questionable, because zinc anodes are sacrificial and are usually replaced at least annually as part of routine maintenance. Ashton obviously came to this conclusion as well.[28] Similarly, I find that compounding and waxing the decks was in the nature of ordinary cosmetic maintenance. Claimant's argument that it was necessary to protect the vessel during repairs and thus loss-related is unpersuasive and, accordingly, recovery

[28] Claimant's Brief, Exhibit L(5): Letter from Mark Ashton to George Stafford dated March 19, 2008

14

of the costs incurred to replace the zincs and compound and wax the decks is denied.

The following is a summary of my findings as to the amounts payable to Claimant for loss-related repairs to his yacht:

| | |
|---|---|
| NEB Invoice No. 127391 | $81,927.46 |
| NEB Invoice No. 128325 | 4,244.11 |
| RubRails.com Invoice No. 129270 | 1,430.00 |
| Claimant's personal expenses | 46.80 |
| NEB Invoice No. 128395 | 5,942.39 |
| Gross loss-related repairs | $93,590.76 |

Attorney's Fees

The second part of the claim is for recovery of Claimant's legal fees and costs, which, in his penultimate claim, amounted to $55,732.70. It is to be noted that as of the final submissions in this matter, Claimant has left it for me to determine whether or not his attorney's fees are recoverable, and if so, in what amount.

Claimant contends that he is entitled to recover his attorney's fees under statutory provisions in either Florida or Massachusetts. In Florida, he argues the recovery of attorney's fees is provided for under two statutes: FS §627.428 and FS§57.105. In Massachusetts, comparable statutes are MGL 176D §3(9) and MGL 93A §9. In essence, all of the statutes cited are "bad faith" statutes, and with respect to Massachusetts particularly provide no discretion to the court: it must award attorney's fees if an insured prevails in circumstances falling within the ambit of the statutes. [29] Claimant contends Respondent's delay in settling his claim, as well as other actions it has taken, forced him to pursue legal remedies that would not have been necessary had Respondent processed the claim in a transparent, forthright and businesslike manner.

---

[29] Claimant's Rebuttal Brief, pp. 13-15.

15

Therefore, under the laws of either state he is entitled to recover his attorney's fees.

Because the insurance contract provides that any arbitration is to be governed by the general maritime law of the United States, it is Respondent's position that attorney's fees may not be awarded unless there is agreement, an applicable statute or bad faith. Respondent has provided several case citations in support of this and contends none of these exceptions are present here. Therefore, Claimant's argument that state law should be applied – whether that of Florida or Massachusetts – is erroneous. Respondent also argues that Florida law is inapplicable in any event because both Campos and his wife are legal residents of Massachusetts, and the insurance contract was written and issued to them in Massachusetts. Moreover, Respondent notes that Massachusetts follows the American Rule, which does not provide for the award of attorney's fees in insurance policy cases.

Attorney's fees are not awarded in arbitration, as a rule, unless provided for in the contract; by subsequent agreement between the parties themselves; by virtue of mutual demands made during the arbitration proceeding; or under extraordinary circumstances such as the refusal or default by one of the parties to participate in the arbitration. Here, however, they may be awarded because the parties have agreed to proceed under SMA rules, which provide arbitrators such discretion in ¶VII, Section 30. What remains to be determined is whether an award of attorney's fees in this case is warranted.

Much of the effort and legal expense in prosecuting and defending this claim appears to have come about as a result of the court actions prior to arbitration. The early misunderstanding surrounding what the documentary requirements were for filing a claim, followed by the issues raised by Claimant's December 6 invoice to Respondent, seems to have been what sparked an apparent mutual distrust and adversarial relationship between the parties. For example, it appears Claimant's reason for filing a complaint with the Florida Department of Financial Services in January 2008 stemmed from an email Claimant interpreted as an accusation by Respondent that he was asserting a fraudulent claim. However, the email Claimant referred to was a response to a request from Claimant's counsel for information regarding statutory fraud

16

language required to be appended to all claim forms in Florida. Respondent was simply providing the requested information. Moreover, the email concluded by stating that *"Zurich is prepared to resolve this matter, but it will require the cooperation of Mr. Campos..."* Then, in a February 21 email, Claimant suggested the parties *"...agree on a procedure for a fast arbitration..."* It was Respondent's alleged failure to respond to this that prompted Claimant to file a motion for declaratory judgment in early May, based upon a theory that by ignoring a demand to arbitrate, Respondent had waived its right to arbitration. It must be remembered that part of the time between February 21 and early May was taken up with the audit at NEB and other issues surrounding the disputed claim, so there was not the complete vacuum of activity that is implied by Claimant. The fraud complaint and Claimant's court motion were, of course, defended by Respondent, all of which took time, and culminated with Judge Hoeveler's Order that granted Respondent's motion to compel arbitration. In his Order, Judge Hoeveler noted *"The arbitration clause in the parties' policy is unambiguous. Indeed, apparently Plaintiff concedes that the arbitration clause governs his dispute with Defendant; however, Plaintiff argues that Defendant's actions constitute waiver of Defendant's right to invoke arbitration...There is no pattern of activity suggesting that Defendant waived its right to enforce the arbitration clause of the parties agreement..."* Despite his awareness that the contract required disputes to be arbitrated, Claimant no doubt had his reasons for pursuing a declaratory judgment instead of filing his own motion to compel arbitration. However, the costs that he incurred in doing so must be borne by him.

After carefully reviewing the parties' respective arguments submitted on this issue, and viewing it in the context of events generally, I find no compelling reason to make an award of attorney's fees and costs in favor of Claimant, and direct that each side bear its own attorney's fees and costs.

Each side has contributed in some manner to the time it has taken to resolve Campos's claims, and I do not find that he has been unduly prejudiced by the delay. Moreover, he is entitled to prejudgment interest on principal amounts that are due him, and I note that both parties agree that the applicable rate of interest should be 5.81 percent per annum measured from

the date of the loss. In this respect, however, Respondent has pro-rated the interest due based on the actual dates of Claimant's various payments to NEB during the course of the repairs. Some of these remittances were made late and incurred a total of over $900 in finance charges from NEB. Claimant has paid the finance charges and they do not constitute part of his claim. Therefore, I find that he is entitled to prejudgment interest on the total amount due to him under this Award, from the date of loss to the date of the Award, and have calculated it accordingly.

The $4,000 hull deductible under the policy must be applied to the amount due to Claimant, and I have done so below.

The arbitrator's fee, in accordance with the arbitration provision of the policy, and as agreed by the parties, is to be equally shared. The fee and its manner of settlement are set forth in Appendix B, which is attached to and forms a part of this Award.

AWARD

Respondent is directed to pay Claimant the sum of $101,836.59, which is arrived at as follows:

| | |
|---|---|
| Total cost to repair vessel | $ 93,590.76 |
| Interest at 5.81 percent per annum from 5/27/07 to 8/26/09 | 12,245.83 |
| Less policy hull deductible | ( 4,000.00) |
| Total due to Claimant | $101,836.59 |

If the above amount is not paid within 30 days from the date of this Award, interest at the rate of 3.25 percent per annum is to continue on the principal sum until paid, or until reduced to judgment, whichever first occurs.

Pursuant to the provisions of Title 9 USC ¶1 *et seq.* (the United States Arbitration Act), for purposes of enforcement this Award may be reduced to judgment in any court of competent jurisdiction.

Stephen H. Busch,
Sole Arbitrator

South Bristol, ME

August 26, 2009

19

```
****************************************************
                                           *
In the Matter of the Arbitration           *
                                           *
        between                            *
                                           *
Stephen G. Campos, as Claimant             *
                                           *          FINAL AWARD
           and                             *          August 26, 2009
                                           *
Northern Insurance Company of New          *
York, as Respondent                        *
                                           *
Under a Master Mariner Yacht               *
Insurance Policy dated April 6, 2007       *
                                           *
****************************************************
```

APPENDIX A – RELEVANT CONTRACT TERMS

Northern Insurance Company Master Mariner Yacht Policy on the *SPLENDEUR DEUX* written for the period 4/06/07 to 4/06/08

### *Duties of An Insured*

*"…You must file with us or your agent within thirty (30) days of our request, a signed sworn proof of loss statement…"*

*In addition, you shall do the following:*

*1. "Use all lawful and reasonable means to recover or protect the insured yacht from further loss or damage.  We will pay the reasonable expenses incurred by you with regard to a covered loss…"*

*4. "… [you must] produce and permit us to copy any and all records we request to verify coverage, the claim, its amount…"*

*"If you fail to comply with any of these duties, there will be no coverage under this policy."*

### *Repairs*

*"If there is a covered loss requiring repainting of part of the insured yacht, we will pay the cost of repainting or resurfacing the damaged area in accordance with customary marine repair practices so that the area repaired will match, as closely as practical, the original color."*

20

"If there is a covered loss to plywood, metal, rubber, plastic, or fiberglass portions of the insured yacht, we have the option of paying:

a) the cost of repairing in accordance with customary marine practices; or
b) the cost of making repairs according to the recommended specification of the manufacturer of the insured yacht..."

<u>Payment</u>

"We will pay any loss under this policy...within 30 days after:

a) reaching an agreement with you; and
b) receiving a signed sworn proof of loss statement or masters protest, receiving a release of liability; or
c) the entry of a final judgment; or
d) the filing of an arbitration award with us."

<u>Arbitration</u>

"If...we disagree about the amount of your loss or damage, the disagreement must be resolved by binding arbitration...:

a) You and we will agree on a single arbitrator...whose fee will be paid 50% by you and 50% by us;
c) The arbitration will be conducted...in accordance with the general maritime law of the United States..."[30]

<u>General Conditions</u>

2. Cooperation with Us

"You must cooperate and assist us with any investigation, settlement or defense of any suit or claim under this policy..."

<u>10. Subrogation (Right of Recovery)</u>

"If a person or organization to or for whom we make payment under this insurance has rights to recover damages from another person or organization, those rights are transferred to us..."

---

[30] Arbitration provision c) also specified that arbitration proceedings would follow the rules of the American Arbitration Association. However, the parties have agreed that this proceeding would be governed by the Maritime Arbitration Rules of the SMA.

21

```
**************************************************
                                    *
In the Matter of the Arbitration    *
                                    *
          between                   *
                                    *
Stephen G. Campos, as Claimant      *        FINAL AWARD
                                    *        August 26, 2009
           and                      *
                                    *
Northern Insurance Company of New   *
York, as Respondent                 *
                                    *
Under a Master Mariner Yacht        *
Insurance Policy dated April 6, 2007 *
                                    *
**************************************************
```

### APPENDIX B – ARBITRATOR'S FEE

The arbitrator's fee in this matter is $5,450.00 and is payable upon issuance of this Award. Pursuant to the Arbitration Clause of the contract, each party is responsible for fifty percent (50%) of the fee, or $2,725.00. However, I direct that the fee be paid in full by Respondent in the first instance. Upon payment of the arbitrator's fee in full, Respondent shall thereafter have the right to deduct $2,725.00, representing Claimant's share of the fee paid on its behalf, from the total amount it owes to Claimant under this Award.

Remittance should be made to:     Stephen H. Busch
                                  36 Texas Road
                                  South Bristol, ME 04568

Notwithstanding the foregoing, the settlement of the arbitrator's fee remains a joint and several obligation of the parties. Upon settlement of the arbitrator's fee in full, any amounts remaining in the respective attorneys' trust accounts for this purpose may be returned to the depositors.

22

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

MICHAEL SILVERI & DEBORAH SILVERI

**(b)** County of Residence of First Listed Plaintiff   MIAMI-DADE
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

STEPHANIE HANDLER
COZEN O' CONNOR
200 SOUTH BISCAYNE BLVD, STE 4410
MIAMI, FLORIDA 33131

**DEFENDANTS**

NORTHERN INSURANCE COMPANY OF NEW YORK, STEPHEN CAMPOS AND DIANE CAMPOS

County of Residence of First Listed Defendant   MIAMI-DADE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

0:09CV61753-UU-Simonton

**(d)** Check County Where Action Arose: ☐ MIAMI-DADE  ☐ MONROE  ☒ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):

a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE _____   DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

THIS IS AN INTERPLEADER ACTION PURSUANT TO 28 USC 1335, 1331, 1333 AND 1337

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE

**FOR OFFICE USE ONLY**

AMOUNT _____   RECEIPT # 547943